United States Court of Appeals
Fifth Circuit

**F I L E D**

November 15, 2005

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

_____

**No. 04-70009**

_____

**DONALD ANTHONY MILLER,**

**Petitioner-Appellee,**

**versus**

**DOUG DRETKE, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION**,

**Respondent-Appellant.**

_____

**Appeal from the United States District Court
for the Southern District of Texas**

_____

Before BARKSDALE, GARZA, and DENNIS, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

In 1982, Donald Anthony Miller was convicted in Texas state court of capital murder and sentenced to death. In 2004, federal habeas relief was conditionally granted for sentencing, the district court concluding that the State violated due process by withholding evidence, in violation of **Brady v. Maryland**, 373 U.S. 83 (1963) (due process violation for prosecution to suppress favorable *material* evidence) (**Brady**-claim). It denied relief for the other claims, including the same **Brady**-claim as applied to guilt/innocence. For those claims, a certificate of appealability (COA) was denied by the district court.

1

The State appealed.  Seeking leave to cross-appeal, Miller requested a COA from this court on three claims; it was denied. *Miller v. Dretke*, 404 F.3d 908 (5th Cir. 2005).

Therefore, at issue is the State's appeal from the conditional relief on sentencing.  Any suppressed evidence was *not* material for sentencing.  **JUDGMENT VACATED; RELIEF DENIED.**

I.

(The following is in large part a repetition of the facts in our first opinion.  *Id.* at 911-12.)  On 2 February 1982, Michael Mozingo and Kenneth Whitt, traveling furniture salesmen, were approached by Miller, Eddie Segura, and Danny Woods, who feigned interest in purchasing furniture.  After Mozingo and Whitt were lured to Segura's house to deliver the furniture, they were robbed, bound, and gagged.  Miller, Segura, and Woods drove Michael Mozingo and Kenneth Whitt to Lake Houston in Harris County, Texas, where, with their hands tied, they were murdered by Miller, with a handgun, and Woods, with a shotgun.

In October 1982, Miller was convicted for capital murder, and sentenced to death, for murdering Michael Mozingo while in the course of committing, and attempting to commit, aggravated robbery. Segura testified against Miller; Woods did *not* testify.  (Before Miller's trial, Segura pleaded guilty to aggravated robbery; Woods, to murder, receiving two life sentences.  Post-trial, Segura was sentenced to 25 years in prison.)

The Texas Court of Criminal Appeals affirmed. *Miller v. State*, 741 S.W.2d 382 (Tex. Crim. App. 1987) (en banc). The Supreme Court denied a writ of certiorari. *Miller v. Texas*, 486 U.S. 1061 (1988).

Miller requested state habeas relief, presenting numerous claims, *but not the pending Brady-claim*. The state district court entered findings of fact and conclusions of law and recommended denial of relief on each claim. *Ex Parte Miller*, No. 350303-A (232d Dist. Ct., Harris County, Tex. 7 May 1997). The Court of Criminal Appeals adopted those findings and conclusions and denied relief. *Ex Parte Miller*, No. 36140-01 (Tex. Crim. App. 1998) (unpublished order).

In February 1999, Miller requested federal habeas relief, raising five claims, including a *Brady*-claim presented for the first time. Following an evidentiary hearing in September 2002, the district court ruled in February 2004 that the *Brady*-claim was not procedurally barred and conditionally granted habeas relief for it, but only for sentencing. *Miller v. Johnson*, H-99-0405, slip op. at 24 (S.D. Tex. 2 February 2004) (*USDC Opn*.). For the other claims, including the *Brady*-claim for guilt/innocence, the district court awarded the State summary judgment and denied, *sua sponte*, a COA for those claims. The court stayed its judgment pending appeal. In short, 22 years passed between the murders and federal habeas relief being granted.

3

Following our denial of a COA for Miller, *Miller*, 404 F.3d at 920-21, oral argument was held on the State's appeal from the conditional habeas relief.  At argument, we ordered supplemental briefing on the State's failure to exhaust claim.

## II.

The State maintains the district court erred by:  (1) considering Miller's *Brady*-claim, because it was not exhausted in state court; and (2) in the alternative, granting relief on that claim for his sentence.

Miller's 28 U.S.C. § 2254 habeas petition is subject to the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *See*, *e.g.*, *Penry v. Johnson*, 532 U.S. 782, 792 (2001).  Generally, a district court is required by AEDPA to defer to the state court's:  (1) adjudication of claims on questions of law and mixed questions of law and fact, unless the state court's "decision ... was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court ...."  28 U.S.C. § 2254(d); *see Hill v. Johnson*, 210 F.3d 481, 488 (5th Cir. 2000), *cert. denied*, 532 U.S. 1039 (2001); and (2) factual findings unless they "resulted in a decision that was based on an unreasonable determination of the facts in [the] light of the evidence presented in the State court proceeding".  28 U.S.C. § 2254(d)(2).  Concerning the latter point, the state court's factual findings are "presumed to be correct"; the petitioner has "the

4

burden of rebutting the presumption of correctness by clear and convincing evidence". 28 U.S.C. § 2254(e)(1).

Obviously, because Miller's *Brady*-claim was not presented in state court, such AEDPA deference does not apply in this instance. The district court's findings of fact are reviewed for clear error; its rulings of law, *de novo. E.g., **Fairman v. Anderson***, 188 F.3d 635, 640 (5th Cir. 1999).

A.

Claims not raised in state court usually cannot be considered on federal-habeas because they are not exhausted. *See* 28 U.S.C. § 2254(b)(1)(A). A federal court may consider an otherwise defaulted claim, however, on a showing of either cause for the default and prejudice or actual innocence. ***Bousley v. United States***, 523 U.S. 614, 622-23 (1998); ***Teague v. Lane***, 489 U.S. 288, 298 (1989). (Miller did not attempt to demonstrate actual innocence.)

Following an evidentiary hearing, the district court ruled Miller's *Brady*-claim was *not* barred because the cause-and-prejudice exception was satisfied: the suppressed evidence was not reasonably available to Miller; and the suppression prejudiced him for sentencing. ***USDC Opn.*** at 20, 24. "Whether a federal habeas petitioner has exhausted state remedies is a question of law." ***Wilder v. Cockrell***, 274 F.3d 255, 259 (5th Cir. 2001).

For its non-exhaustion claim, the State maintains the district court erred in concluding there is no available state corrective

5

process for Miller's claim and in failing to dismiss the claim without prejudice to allow him to pursue a successive state habeas application. On a related point, the State notes that the district court is barred by AEDPA *from granting, but not denying*, habeas relief on non-exhausted claims. *See* 28 U.S.C. § 2254(b)(1)(A).

Miller urges the State should be estopped from now asserting his claim is not procedurally barred in state court because it took the opposite position in earlier proceedings in district court. Miller maintains the State seeks to gain an unfair advantage if the claim is returned to state court because, if he is denied relief there, the state court decision will be subject to the above-discussed AEDPA deference.

As noted, under § 2254(b)(2) we can *deny* (but *not* grant) Miller's non-exhausted claim. Because we hold Miller is *not* entitled to habeas relief on the **Brady**-claim, we need not decide whether the district court erred in considering it.

"[T]he Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." *Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995) (addressing factors underlying when suppressed evidence is material for *Brady*-claim purposes and manner by which such evidence is to be considered). Therefore, the well-known elements for a *Brady*-claim are: (1) the prosecutor *suppressed* evidence, (2) *favorable* to the defense, (3) and *material* to guilt or punishment. *Brady,* 373 U.S. at 87. (Accordingly, "the good faith or bad faith of the prosecution" is *not* an element. *Id.*)

Evidence is *material* if there is "a *reasonable probability* that, had the evidence been disclosed to the defense, the result of the proceeding would have been different". *United States v. Bagley*, 473 U.S. 667, 682 (1985) (emphasis added). This reasonable-probability standard is met if the suppression is significant enough to undermine confidence in the outcome of the trial. *Kyles*, 514 U.S. at 433-34.

In determining whether evidence is material for *Brady* purposes, we must consider the cumulative effect of all suppressed evidence, rather than ruling on each item individually. *Id.* at 436-37. The district court's rulings on materiality are reviewed *de novo,* because they involve mixed questions of law and fact. *See Felder v. Johnson*, 180 F.3d 206, 212 (5th Cir.), *cert. denied*, 528

7

U.S. 1067 (1999); *Trevino v. Johnson*, 168 F.3d 173, 184 (5th Cir.), *cert. denied*, 527 U.S. 1056 (1999).

The murders occurred in February 1982; Miller was convicted that October. During a pre-trial motion, the prosecutor claimed **Brady** did not require his disclosing impeachment evidence, but only evidence exculpatory to Miller's guilt. The trial court did not require disclosure of additional evidence. Miller contends the State suppressed the following material evidence that it had generated: (1) statements by Ray McCall in 5 and 20 May 1982 interviews; (2) statements by Archie Morris in a 5 May 1982 interview; and (3) affidavits of four persons who did not testify.

The district court found investigator's notes from these two interviews with McCall were suppressed. At trial, McCall testified as follows. On the night of the murders, McCall, the brother of Segura's then girlfriend, Monica McCall, visited Miller's home after the murders had been committed. Outside Miller's presence, Segura and Woods described the night's events to McCall. Miller paid McCall to go to the murder site later that night, to confirm the bodies were still there; McCall was unable to find them, but returned with Miller and did so.

In notes from the *5 May interview*, an investigator acknowledged McCall's not having told the truth on prior occasions. The district court found these notes raised questions about McCall's credibility and were important because McCall corroborated

8

testimony by Segura, who had been present at the murders and was the State's key witness. **USDC Opn.** at 22.

In the *20 May interview,* McCall stated: on the night of the murders, Woods and Segura said nothing about them, but admitted only to the robbery; and he went home around 9:00 p.m. (mentioning nothing in the statement about going to look for the bodies either alone or with Miller). The district court noted McCall's statements during this interview differed from his trial testimony and could have been used for impeachment. **Id.**

Morris (the grandfather of Ray and Monica McCall, as well as of Miller's then girlfriend) was the source for the .38 caliber handgun used in the murders. The district court found prosecutor's notes of Morris' 5 May statement that he owned only a *.22 caliber handgun* had *not* been given to Miller. At trial, Morris testified: just prior to the murders (though he could not recall precisely when), Miller had borrowed from him the *.38 caliber handgun used in the murders;* and McCall returned it to him sometime after the murders. While not specifically addressing Morris' contradictory statements, the district court found the suppressed evidence undermined Segura's credibility, as well as the value of McCall and Morris' corroborating testimony. **Id.** at 24.

The State concedes suppression of affidavits from four who did not testify: Robert White, Tommy Holsinger, Tammie Jones, and Melissa Spears. They had been in a group with Woods on the evening

9

of 2-3 February 1982, after the murders earlier that evening.  In their affidavits, each affiant told police they overheard Woods brag about the murders.  Detective Clampitte was one of the investigating officers; arrested Miller, Segura, and Woods; and took the four statements.  Miller's counsel asked the Detective about the affidavits on cross-examination at trial (Miller's counsel knew the names of the affiants without the Detective having named them); and Detective Clampitte testified about them, but the trial court refused their being then provided to Miller.

Again, Woods did not testify.  White's affidavit stated Woods told him that, after one of the victims was hit with a shotgun blast, "[e]ither Danny [Woods] or the guy with Danny then reached down into his boot and pulled a .38 pistol and shot the other guy when he started to run".  White's affidavit also stated that, when Woods visited White the day after the murders, Woods denied Miller was one of the shooters.  Jones' affidavit describes Woods having possibly said a .45 caliber handgun was used in the murders.  Holsinger's affidavit suggests Woods took full responsibility for the murders and left Holsinger with the impression "it was an everyday thing with him".  The district court found the affidavits indicated *Woods*, *not Miller*, killed both victims and that Segura was armed.  ***Id.*** at 23.

Referring primarily to McCall and Morris' statements, and applying ***Brady's*** above-described three-part test, the district

10

court ruled: (1) the State withheld evidence; (2) it was favorable to Miller; and (3) it was material, *but only for sentencing*. **USDC Opn.** at 26. In ruling earlier on the procedural-bar prejudice element, the district court held: although Miller's "*complicity in the killings is not seriously disputed*", Miller "*challenge[d] his portrayal as the ringleader and shooter*, a role that warranted conviction for capital murder and imposition of the death sentence". **Id.** at 23 (emphasis added). In ruling on the **Brady**-claim, the district court noted: "The analysis for [**Brady**-] materiality tracks that of [procedural-bar] prejudice". **Id.** at 26. It held: "the newly disclosed evidence raises significant doubt about the outcome of the trial, particularly the punishment assessed"; and "the State's refusal to disclose material evidence ... vitiated the sentence imposed". **Id.**

Following Miller's conviction, in order to sentence him to death, the jury was required to, and did, unanimously answer two special issues in the affirmative:

SPECIAL ISSUE NO. 1

Whether the *conduct* of the defendant that caused the death of the deceased was committed *deliberately* and with the *reasonable expectation that ... death ... would result.*

SPECIAL ISSUE NO. 2

Whether there is a *probability* that the defendant would commit criminal acts of violence that would constitute a *continuing threat* to society.

11

TEX. CODE CRIM. PROC., art 37.071(b) (Vernon 1981) (emphasis added). (Miller's trial was held before a third special issue for mitigation was added to the Texas death penalty statute in 1991. TEX. CODE CRIM. PROC., art 37.071, § 2(e)(1), added by 1991 Tex. Sess. Law Serv. Ch. 838 (S.B. 880) (Vernon).) Therefore, for those two answers, at issue is whether "there is a reasonable probability that, had the [suppressed] evidence been disclosed to [Miller], the result of the [penalty phase] would have been different". *Bagley*, 473 U.S. at 682.

The State maintains: the trial transcript demonstrates that much of the claimed suppressed evidence was disclosed (again, the State concedes suppression only of the four affidavits of non-testifying witnesses); any suppressed evidence provides only incremental impeachment value and is, therefore, *not material*; and, in other words, given the comprehensive evidence of Miller's guilt and future dangerousness, even if suppressed evidence had been disclosed, there is *not* a reasonable probability the sentence would have been different.

Keying on all three elements for a *Brady* claim, Miller responds: the district court's determination that evidence was suppressed is reasonable; the State fails to demonstrate the suppressed evidence was *not* favorable; and the district court ruled correctly that there was a reasonable probability the result of the

12

penalty phase would have been different had the suppressed evidence been disclosed.

1.

The most substantial evidence at issue is McCall's lengthy 20 May statement, which was recorded and transcribed. As discussed, McCall stated: on the night of the murders, Woods and Segura said nothing about them, admitting only to the robbery; and he went home around 9:00 p.m. He said nothing about going to look for the bodies.

Regarding that statement, the State acknowledges that Miller's *state habeas counsel* received only one side of the two-sided interview tape; but, it maintains Miller's *trial counsel*, Rick Stover, received the tape-recorded and transcribed statement in their entirety and cross-examined McCall about the statement. In support of this contention, the State points to Stover's use of the term "destruction derby", found on the second side of the tape, in cross-examining McCall, demonstrating Stover must have listened to the entire tape. At the district court evidentiary hearing in 2002 (approximately 20 years after the trial), the prosecutor, Olsen, testified he gave Stover the tape and *probably* gave him the transcript. Although Stover testified at the evidentiary hearing that he did not remember receiving a transcript of the tape, he admitted that, based on his review of his cross-examination of McCall, it was obvious he (Stover) must have heard the tape.

13

Citing numerous comments in the statement that would have been damaging to Miller, including, *inter alia*, McCall's discussion of Miller's previous criminal activity, the State questions whether it would be favorable to Miller. For example, the statement includes McCall's description of Miller's involvement in numerous automobile thefts, smoking marijuana, selling methamphetamine, and moving the stolen furniture out of Segura's house following the murders. The State points out: Miller claims McCall, in his 20 May statement, denied having viewed the bodies; but, there is no denial – the topic is simply absent from the statement.

Given the absence of any denial, and use by Stover, in cross-examining McCall, of much of the information in the 20 May statement, the State contends Miller cannot demonstrate suppressed portions of the statement, if any, were material. Rather, according to the State, given the extensive corroborative evidence against Miller, the statement only provided incremental impeachment value that is *not* material for **Brady** purposes. *See* **Edmond v. Collins**, 8 F.3d 290, 294 (5th Cir. 1993). In this regard, the State points to McCall's acknowledgment at trial that he had previously been untruthful.

Miller counters that McCall's 20 May statement was at least *partially* suppressed and was favorable and material. Miller concedes Stover's cross-examination of McCall at trial and Stover's testimony at the district court evidentiary hearing indicate he

14

received part of the tape. Miller contends, however, that the district court reasonably found it was suppressed, given the State's on-the-record, pre-trial incorrect position concerning its obligation to produce impeachment evidence and its failure at the state habeas proceeding to disclose the transcript of the interview. In addition, Miller maintains Stover failed to cross-examine McCall about the most damaging portions of the 20 May interview (McCall's claim the co-defendants said nothing about the murders and that he left Miller's house alone an hour and a half after arriving and did not return until the next day), something Stover would have asked about had he received the entire tape or transcript.

Miller next claims the 20 May interview was favorable because, as the district court found, it constituted a "hornbook example[] of impeachment evidence". *USDC Opn.* at 26. McCall's 20 May statement differed from his trial testimony. Therefore, according to Miller, it could be used to impeach McCall and was thus favorable to Miller.

Finally, Miller asserts that the statement is material, based on several important differences between it and McCall's trial testimony and the State's reliance on McCall's testimony, particularly at sentencing. Miller emphasizes especially McCall's failure in the statement to mention searching for the bodies on the night of the murder, either alone or with Miller; instead, McCall

15

claimed he left Miller's house at approximately 9:00 p.m. Miller asserts that, according to Stover's testimony at the district court evidentiary hearing, McCall's testimony about seeing the bodies, including his detailed description of their position and appearance, was some of the most damning at the trial. Miller contends the State's persistent references to McCall's testimony in closing argument demonstrates the materiality of any information that could have been used to impeach him. Given the importance to the State of McCall's testimony, Miller contends there is a reasonable probability that, had it been impeached, at least one juror would have answered one of the special issues differently.

2.

The transcription of Olsen's notes from 5 May covers several interviews, including with McCall and Morris. At McCall's 5 May interview, he acknowledged having been untruthful previously, admitted to helping Segura and Miller dispose of the stolen furniture, but denied any responsibility for disposing of the .38 caliber handgun. At the district court evidentiary hearing, Stover testified that, although he could not specifically remember, he did not believe he received the 5 May notes; he testified they were material because of their usefulness in impeaching McCall and the extent to which the State relied on McCall's testimony.

The State maintains the notes were neither suppressed nor material. They reflect Olsen's impression that McCall was not being truthful. According to the State, because the prosecutor

(Olsen) and Miller's counsel (Stover) questioned McCall at trial about his prior inconsistent statements, Miller cannot demonstrate the 5 May interview notes were either suppressed or material.

Miller maintains the 5 May notes from McCall's interview demonstrate, *inter alia*, that McCall met with Olsen many more times than he admitted at trial and contribute to the defense theory that McCall pandered to prosecutors. Miller contends the district court did not err in finding the 5 May notes, in conjunction with other suppressed evidence, material for sentencing. **USDC Opn**. at 26.

3.

As discussed, at his 5 May interview, Morris denied having a .38 caliber handgun, stating he had only a .22 caliber handgun that he never gave to Miller. At trial, Stover did not question Morris about these denials. At the district court evidentiary hearing, Stover testified that, had he been provided Morris' statement, he would have impeached him with it and perhaps implied that McCall, not Miller, was the shooter. The district court determined Morris' statement was "hornbook ... impeachment evidence" and, together with other suppressed evidence, its suppression resulted in a **Brady** violation for sentencing. **USDC Opn.** at 26.

The State maintains Miller cannot demonstrate the notes were suppressed. In the alternative, it contends that, even if Stover did not receive the notes about Morris' prior inconsistent statement, the statement was not material in the light of the

17

following evidence corroborating Morris' trial testimony: Segura testified he and Miller stopped at Morris' house prior to the murders; McCall testified that, after the murders, he received the .38 caliber handgun from Miller and returned it to Morris; and, Morris' neighbor, Tommy Reyes, testified Morris gave him the gun for safe keeping after the murders. The gun was found by investigators at Reyes' home.

Miller responds that, had Morris' testimony been impeached, the jury could only connect Miller to the murder weapon through the testimony of Segura and McCall, both of whom had motivation to implicate Miller and to satisfy prosecutors. According to Miller, Morris' statement leaves open the possibility Segura obtained the gun from Morris and supports the defense theory that either Segura or McCall could have shot Michael Mozingo (the murder for which Miller was tried). Miller maintains it was not error for the district court to find Morris' statement material to sentencing.

4.

As discussed, starting with his cross-examination at trial, the four affidavits of non-testifying witnesses were covered by Detective Clampitte, who testified to having taken them shortly after the murders. The Detective had the affidavits when he testified and, at one point, refreshed his recollection by reviewing them. After the Detective testified to having the affidavits, Stover asked for them; Olsen objected; and the court sustained the objection. Stover later asked again for the

18

statements, but the trial court again denied his request. The affidavits were not specifically addressed at the district court evidentiary hearing.

While the State concedes the affidavits were suppressed, it maintains: their substance was disclosed to Stover in the offense reports; and, even if not so disclosed, they were *not* material. The State also maintains: the statements are inadmissible hearsay and thus cannot be material; even if they were admissible, because they are not inconsistent with testimony at trial that Miller was a shooter, they could not affect the outcome of sentencing; and, portions of the affidavits could have been harmful to Miller at trial.

Miller counters that the affidavits would have been admissible under the Texas Rules of Evidence, because Detective Clampitte testified from them and used them to refresh his recollection. *See* TEXAS CODE OF CRIMINAL PROCEDURES, Art. 38.24, V.A.C.C.P. (1985) (now TEX. R. EVID. 106 and 107). The affidavits, according to Miller, were material, in part due to the manner by which they were introduced – through the testimony of the homicide detective for the case: through that testimony, the jury was invited to conclude Woods had implicated himself and Miller to the four affiants. Miller contends portions of the affidavits, most importantly White's statement that Woods said the other shooter pulled the .38 from his *boot*, support a conclusion that someone other than Miller

19

was the shooter, because, according to Miller, it was clearly established at trial that he was *not* wearing boots at the time of the murders. Miller also points to White's statement in his affidavit that, the day after the murders, Woods denied Miller was involved. Jones' affidavit provides Woods *may have said* a .45 was used in the murders; Miller claims this supports the possibility Segura, who was known to have a .45, was also armed. According to Miller, in evaluating the suppressed affidavits together with the other suppressed evidence, the district court did not err in determining at least one juror would have answered the deliberateness issue differently.

C.

For the three **Brady**-claim elements, the State maintains the evidence in issue is *not* material; in addition, it claims: it *did not* suppress evidence, other than the four affidavits; and any suppressed evidence was *not* favorable to Miller. In the light of our holding, *infra*, that the evidence is *not material* to the jury's answering either of the special issues in the affirmative, we need not decide whether the evidence was either suppressed or favorable. (It appears, however, that a substantial portion of it was neither suppressed nor favorable.)

Again, evidence is material under **Brady** if there is a reasonable probability the result of the proceeding (here sentencing) would have been different had the evidence been

disclosed; a reasonable probability is one sufficient to undermine confidence in the outcome. *Kyles*, 514 U.S. at 433-34. As discussed, for determining materiality, the evidence is considered "collectively, not item by item". *Id.* at 436. "We evaluate the *tendency and force* of the undisclosed evidence *item by item*; there is no other way. We evaluate its *cumulative effect* for purposes of materiality separately ...." *Id*. at 437 n.10 (emphasis added). If the evidence provides only incremental impeachment value, it does not rise to the level of *Brady* materiality. *See Drew v. Collins*, 964 F.2d 411, 419-420 (5th Cir. 1992), *cert. denied*, 509 U.S. 925 (1993).

1.

First, the evidence from 5 and 20 May interviews with McCall lacks force in the light of other, overwhelming evidence presented at trial. For example: (1) Miller admitted to Jimmy Douglass they had "ripped off" some furniture; (2) Ronald Theiss testified Miller brought Segura's car to his shop for repair and repainting and left new furniture in his front yard at that same time; (3) Segura testified in great detail about Miller's shooting both Mozingo and Whitt; (4) Woods was seen by Robert Fletcher with the victims immediately before their murders, and Woods was seen in Segura's car with two other people around the same time; (5) Miller tried to sell the stolen furniture soon after the murders; (6) Miller's fingerprints were found on a piece of paper in the back of the

21

furniture truck and on one of the stolen tables stored in a warehouse; (7) Miller and Segura rented a storage unit to store furniture in the same facility used by McCall soon after the murders; (8) Morris testified Miller obtained the .38 caliber handgun from him; and (9) McCall testified Woods and Segura admitted to robbing the victims. None of this evidence could be undermined by either of the May statements given by McCall.

Miller contends Stover could have impeached McCall's testimony on the basis of his prior untruthfulness. That McCall had been untruthful previously, however, was presented to the jury because McCall admitted it on direct examination. Stover also impeached McCall with this information and questioned McCall's motivations for testifying. The jury had the opportunity to weigh McCall's credibility and credit his testimony accordingly.

Miller contends McCall's failure to mention in his 20 May statement viewing the bodies either alone, or with Miller, on the night of the murders is particularly probative. However, McCall's failure to do so is understandable; and, as the State points out, it does not make it more or less likely that Miller committed the crimes for which the death penalty was warranted.

Olsen's notes of the 5 May interview of McCall are relatively brief. Most importantly, they contain McCall's admitting he had not been truthful previously and his denying having anything to do with possessing, or disposing of, the .38 caliber handgun after the

22

murders.   Again, Miller maintains Stover could have used this evidence to impeach McCall.   However, as noted, both Olsen and Stover questioned McCall about prior inconsistent statements.   And, Stover elicited an admission by McCall that he only told the State about Miller's comments to him *after* McCall entered guilty pleas on three new charges.   A review of all of McCall's testimony reveals that he was thoroughly impeached as dishonest and a criminal. Because McCall was thoroughly impeached at trial, the notes of the 5 and 20 May interviews have only incremental impeachment value.

2.

Likewise, the 5 May notes of the Morris interview lacked force in the light of trial testimony about his .38 caliber handgun. Those notes and Morris' trial testimony were very brief.   That Morris at first denied owning a .38 could not be said to have affected the outcome of sentencing, particularly in the light of evidence corroborating his trial testimony:   Segura testified he and Miller stopped by Morris' house prior to the murders to obtain a gun; McCall testified he received the .38 from Miller after the murders and returned it to Morris at Miller's request; Morris' neighbor, Reyes, a witness who had no other connection to Segura, Miller or McCall, testified Morris gave him the .38 caliber handgun for safe keeping after the murders; McCall advised investigators they could find the gun at Morris' house; the gun was recovered from Reyes' garage; and bullets recovered from the bodies were

23

consistent with the .38 recovered from Reyes' garage. In addition, as noted, Miller's then girlfriend was Morris' grandchild. In his statement, Morris also stated: "He [did] not know whether ... [Miller] was able to get a pistol from his house. Perhaps [Miller] had left or hidden one there earlier. However, he did not remember seeing [Miller] get a pistol from his house with his permission." Obviously, this indicates Miller was, *inter alia*, very capable of obtaining a gun from Morris' home.

### 3.

Finally, the four affidavits, in many ways, support Miller's guilt and do not contradict Segura and McCall's testimony. None of the affiants were witnesses to the robbery and murders; their only knowledge was from Woods' statements. Given the circumstances surrounding Woods' statements to the four affiants, their reliability is highly suspect. White and Holsinger's affidavits reflect most of Woods' statements were made late at night after they had smoked marijuana. Conversations forming the basis of Jones and Spears' affidavits were in the early morning hours after drinking in a club with them, White, and Holsinger; and both Jones and Spears stated in their affidavits that Woods appeared to be high on narcotics. Moreover, the substance of the affidavits was presented to a substantial degree to the jury by Miller's cross-examination of Detective Clampitte.

### D.

24

Having evaluated each item of evidence, we must now evaluate the cumulative effect for purposes of materiality. Of course, in doing so, the foregoing discussion of the evidence is in play.

1.

The first special issue required the jury to find Miller's conduct that caused Michael Mozingo's death was both *deliberate* and with the *reasonable expectation* death would occur. Miller repeatedly contends, and the district court noted, that the allegedly suppressed evidence undermines Miller's role as the ring leader. However, even if he did *not* have that role, there is overwhelming evidence he was deeply involved in the robbery and murders. In other words, his conduct was deliberate. And, given the overwhelming evidence of Miller's involvement in the crimes and of at least two of the participants being armed, it is completely implausible Miller could have participated and not anticipated death would occur.

Accordingly, having reviewed the record, and in the light of the evidence presented to the jury, the brutal nature of the crimes, and the callousness with which the victims were treated, we do not find a reasonable probability any juror would have answered the deliberateness special issue differently, even if all the allegedly suppressed evidence had been disclosed.

2.

The second special issue required the jury to find Miller would both commit violent crimes and be a continuing threat to society (future dangerousness). It does *not* appear that Miller contends the allegedly suppressed evidence is material for this special issue. In any event, for all of such evidence, only a small portion of McCall's 20 May statement could be said to be even tangentially relevant to this issue - his statements that Miller was not violent. This statement, made by Miller's friend and admitted partner in crime, could hardly be material.

For example, prior to the murders in early 1982, Miller had pleaded guilty in March 1980 to stealing a truck, for which he was sentenced to probation. That October, his probation was revoked, and he was sentenced to three years in prison when he pleaded guilty to stealing an automobile while on probation. At the punishment phase, in addition to these two convictions, testimony was offered that, after Miller was released from the penitentiary, he had been involved in an armed robbery of illegal drugs and another planned drug robbery (additional criminal conduct). The two convictions and additional criminal conduct occurred between when Miller was 18 years of age in 1980 and when he committed the instant murders in conjunction with armed robbery in early 1982. Accordingly, the State argued to the jury that Miller's criminal conduct had progressively become more violent. This additional

26

criminal conduct provided a further basis on which the jury could have found against Miller on the future dangerousness special issue.

In sum, given Miller's criminal history and the nature of the murders, there is no reasonable probability any juror would have answered that special issue differently had all the allegedly suppressed evidence been disclosed; there is no reasonable probability that such disclosure of evidence would have resulted in a different outcome at sentencing. Restated, in the light of the comprehensive evidence bearing on sentencing, even if the allegedly suppressed evidence had been disclosed, this does *not* undermine our confidence that Miller would have still received the death penalty.

## III.

For the foregoing reasons, the conditional habeas relief granted Miller is **VACATED;** and habeas relief is **DENIED.**

*VACATED; DENIED*

27

EMILIO M. GARZA, Circuit Judge, dissenting:

Unlike the majority, I conclude that, although Miller has not exhausted his state remedies, denial of relief on the merits under 28 U.S.C. § 2254(b)(2) is not appropriate because Miller has at least made a colorable federal claim for relief. I would remand to the district court with instructions either to dismiss the proceedings for failure to exhaust or to stay and abey them while Miller brings his *Brady* claim before a state habeas court. Accordingly, I respectfully dissent.

Miller did not present his *Brady* claim in his state habeas application because he did not receive the relevant evidence until after he had filed his federal habeas petition. Texas permits subsequent applications in death penalty cases in three distinct circumstances: 1) when the factual or legal basis for the new claims or issues was not available at the time of the original petition; 2) when the applicant can show by a preponderance of the evidence that no rational juror would have found the applicant guilty but for the violation of the constitution; or 3) when the applicant can show by clear and convincing evidence that no rational juror would have answered affirmatively any of the special issues submitted in capital cases. TEX. CRIM. PROC. CODE ANN. art. 11.071 § 5(a)(1)-(3); *see Ex parte Graves* 70 S.W.3d 103, 115 & n.49 (Tex. Crim. App. 2002) (stating that Texas has three exceptions to the general rule against successive habeas petitions and listing those described above).

The district court erroneously read the first two exceptions as two elements of a single exception and therefore incorrectly determined that Miller would have to demonstrate that he could meet *either* the first and second exceptions *or* the third. Because it concluded that he could not satisfy the second or third exception, the district court held that Miller had no state forum in which to bring his *Brady* claim and that he had therefore exhausted his state law remedies. This holding was in error because Miller would be able to bring a subsequent application in Texas court under the first exception.[1]

When a federal habeas petitioner brings an unexhausted claim, the court should either dismiss the proceedings for failure to exhaust or stay and abey them until a state habeas court has had the opportunity to hear the claim. *Rhines v. Weber*, __ U.S. __, 125 S.Ct. 1528, 1534 (2005). Under *Rhines*, stay and abeyance is appropriate when the district court finds that: 1) there was good cause for the failure to exhaust the claim; 2) the claim is not plainly meritless; and 3) there is no indication that the failure was for purposes of delay. *Id.* at 1535. The parties have not

---

[1] Although many years have passed since Miller learned of the factual basis for his *Brady* claim, it does not seem that he would be time barred from bringing it in a subsequent habeas application. Article 11.071 has detailed scheduling deadlines for initial habeas applications, but it does not provide such guidelines for successive applications. *See generally* TEX. CRIM. PROC. CODE ANN. art. 11.071.

briefed the first and third elements, so the district court would need to make the appropriate findings on remand.[2]

The second element, however, has been thoroughly briefed, and I conclude that Miller's *Brady* claim is not plainly meritless because the various pieces of evidence, taken together, could have raised a reasonable doubt in a juror as to either special interrogatory. *See United States v. Bagley*, 473 U.S. 667, 682 (1985) (holding that evidence is material under *Brady* if there is a reasonable probability that, had it been disclosed, the result of the proceeding would have been different); *United States v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004) (holding that when there are multiple *Brady* violations, the court must analyze the cumulative effect of the suppressed evidence).

The first piece of evidence at issue is notes and transcripts from interviews with McCall. Effectively impeaching McCall was crucial to the defense given the weight the prosecution asked the jury to place on McCall's testimony. As the majority points out,

---

[2] I suspect that the cause for Miller's failure to exhaust was Texas's two-forums rule, which would prevent him from bringing his *Brady* claim in state court while his exhausted claims were pending in federal court. *See Ex parte Powers*, 487 S.W.2d 101 (Tex. Crim. App. 1972). Because Miller did not discover the suppressed evidence until after he had filed his petition in federal court in 1999, he would have had to forego federal habeas review of his exhausted claims if he chose to pursue his *Brady* claim in state court. Texas has since lifted its two-forum rule, which means that the state court could now hear Miller's claim if we stayed the proceedings rather than dismiss them. *See Ex parte Soffar*, 143 S.W.3d 804, 807 (Tex. Crim. App. 2004).

McCall was generally impeached on cross-examination as a dishonest criminal who was not always truthful with the police during the course of the investigation. Nevertheless, there is a significant qualitative difference between evidence that a witness is generally not truthful and specific evidence that he gave inconsistent statements with respect to the subject of his crucial testimony. I disagree with the majority's position that specific impeachment material is only of incremental value in light of abundant general impeachment material. The defense was not able to cross-examine McCall about his statements in the May 20 interview in which he specifically denied that Woods and Segura had confessed the murders to him and made no mention of going to the crime scene with Miller. Those statements specifically contradicted his trial testimony. Had the jury been able to hear that in addition to being generally dishonest, McCall had made specific statements inconsistent with the heart of his trial testimony, it might have given his testimony less weight. McCall provided important corroboration of Segura's account of the crime, which portrayed Miller as a leader in the killings, so weakening his testimony could have cast doubt on whether Miller planned the killings and was an actual shooter.

The second piece of allegedly suppressed evidence was police notes from interviews with Morris. Morris, who testified that he had given his .38 caliber handgun to Miller in the days before the murders, was not impeached with prior inconsistent statements at all. His testimony provided critical corroboration from someone

uninvolved with the crime linking Miller to one of the murder weapons, which showed at sentencing that Miller had orchestrated the murders in advance. The majority notes that Reyes, Segura and McCall could corroborate Morris's testimony. Reyes, however, could only corroborate Morris's account of what happened after the murders, not before, so he could not bolster that part of Morris's testimony that was most important at sentencing, i.e. that Miller procured a weapon days in advance of the murders. Moreover, Segura and McCall's corroboration was of limited value because of their limited credibility. Indeed, Morris's testimony functioned at trial to provide credible, disinterested corroboration of their account of the crime. The majority's reliance on Segura and McCall to bolster Morris's account therefore begs the question.

The third group of evidence at issue consists of affidavits of four non-testifying witnesses. One affiant, Robert White, stated that Woods had confessed to the murders and implied that Miller was not a shooter. Another affiant stated that Woods might have said that a .45 caliber gun was used. That statement is significant because McCall testified that Segura kept a .45 in his car, which was used to transport the victims. The majority concludes that the affidavits are not material because they are unreliable in that they were based on conversations that occurred either late at night or early in the morning after the declarants and Woods had either smoked marijuana or drank alcohol. I am unconvinced that jurors would necessarily find unreliable a person's

recollection of statements heard while intoxicated. In addition, if they focused on Woods's intoxication, rather than the affiants', jurors might find the evidence quite reliable, as intoxication often makes one less reticent to speak the truth.

The majority correctly points out that the jury did not need to believe that Miller was the ringleader or a shooter to find that he acted deliberately and with the reasonable expectation that the victim would die, the question of the first interrogatory. On the other hand, a juror could believe that Miller was complicit in the robberies and also have a reasonable doubt that Miller expected Mozingo to die during their course. The strongest evidence of Miller's expectation that Mozingo would die was: 1) that he procured the gun from Morris, showing that he had planned the murder; 2) McCall's testimony portraying Miller as a ringleader in the crime; and 3) Segura's account of the crime, which pointed to Miller as a shooter. The suppressed evidence casts doubt on each of these.

Undermining the portrayal of Miller as the ring leader and shooter could have also affected the jury's finding that Miller posed a future danger of violent crime, the question of the second interrogatory. The majority concludes that the exculpatory evidence is not material to this inquiry given Miller's criminal history. That history alone, however, does not necessarily suggest that Miller would go on to commit violent crime in the future. While Miller's criminal history was becoming increasingly serious, it did not include episodes of actual violence. Testimony that Miller had a central role in planing and carrying out the murders, therefore, was by far the best evidence of his future dangerousness.[3] Because the suppressed evidence would have undermined the strongest

---

[3]    Admittedly, the jury also heard evidence that Miller planned to kill Segura for testifying in this case, but that evidence came from McCall.  The exculpatory evidence, as discussed above, would have allowed the defense to better impeach McCall.

indicators of Miller's future dangerousness, it might have caused a juror to find reasonable doubt that Miller would commit violent crimes in the future.

Based on the above, I find the materiality question to be close. At the very least, Miller's *Brady* claim is not plainly meritless. For that reason, I would remand to the district court with instructions to determine if the first and third prongs of *Rhines v. Webber* are satisfied and to stay and abey the proceedings if they are.

The majority dismisses the petition on the merits rather than for failure to exhaust. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Denial of relief under § 2254(b)(2), however, is "inappropriate" unless "it is perfectly clear that the applicant does not even raise a colorable federal claim." *Mercadel v. Cain*, 179 F.3d 271, 276 n.4 (5th Cir. 1999) (quoting *Granberry v. Green*, 481 U.S. 129, 135 (1987) and collecting cases). As demonstrated above, Miller's *Brady* claim is at least colorable, so dismissal under § 2254(b)(2) is inappropriate.

Under the AEDPA, our task is to review the state habeas court's findings and conclusions, not to make those determinations ourselves. *See* 28 U.S.C. § 2254(d). In keeping with that scheme, I would follow *Mercadel* and allow the state court an opportunity to resolve the factual and legal issues in dispute. I would further instruct the district court to determine, under *Rhines*, whether to dismiss the proceedings or stay and abey them until the state court has had such an opportunity.