# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-50023

United States Court of Appeals
Fifth Circuit

**FILED**

December 22, 2016

Lyle W. Cayce
Clerk

ANGELA ORR, heir to Ahmede Jabbar Bradley; MONTERIA BROWN, heir to Ahmede Jabbar Bradley; TASHIKA WRIGHT, as next friend of minor Z.B.; NEACHOLE VEAL, as next friend of minor Z.B.,

>  Plaintiffs - Appellees

v.

OFFICER ERIC COPELAND,

>  Defendant - Appellant

---

Appeal from the United States District Court
for the Western District of Texas

---

Before CLEMENT, PRADO, and OWEN, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

In this qualified immunity case, the question on appeal is whether the district court erred in holding that—in the absence of video evidence—eyewitness testimony should not be considered for summary judgment purposes until subject to cross examination. Because we conclude that it did, we REVERSE.

## I.

On April 5, 2012, at approximately 6:30 p.m., police officer Eric Copeland of the Austin Police Department stationed his patrol car near an intersection in a high crime neighborhood. He parked his car in a way that blocked his view

of the street, so he could hear but not see oncoming traffic. He was listening for violations of the city's amplified noise ordinance. He admits that he had a secondary motivation for this: in Copeland's experience, individuals who blared loud music while driving often had illegal drugs concealed in their vehicles.

After about ten minutes, Copeland heard a car blasting loud music approaching and decided to pull it over. He pulled out behind the vehicle—a black Toyota Camry with tinted windows—when it passed and turned on his flashing lights and sirens. By doing so, he also automatically activated the video and audio recording devices on his dashboard and the audio recording device on his person. The vehicle he was following did not pull over for a couple of blocks but ultimately came to a stop in a gas station parking lot.

Copeland exited his vehicle and approached the Camry on foot. The driver of the car, Ahmede Bradley, was a black male in his mid-thirties. Bradley rolled down the window when Copeland approached but did not speak or look at the officer directly. Instead, he looked straight-ahead and nervously shuffled some papers in his hands as he continued to smoke.

Copeland noticed several things that suggested to him that Bradley might be a narcotics trafficker. First, Bradley had some white residue smeared on the left side of his mouth that Copeland thought looked like crack/cocaine powder. Second, there was a messenger bag sitting in the back seat with plastic baggies sticking out of one of the pockets. Copeland had frequently seen similar baggies used to package and distribute drugs. Third, despite the presence of an unusual number of air fresheners and the smoke from the cigar Bradley was smoking, Copeland could still "smell[] the distinct odor of marijuana."

After a brief conversation about the odor and his criminal history, Copeland asked Bradley to step out of the vehicle. Bradley refused, keeping his door locked and rolling up his window. Although Copeland ordered Bradley to

No. 16-50023

stop, Bradley drove off at high speed. Believing that Bradley was involved in serious drug crimes, Copeland reentered his vehicle, notified dispatch that the suspect was fleeing, and gave chase.

The subsequent pursuit lasted less than a minute. Bradley drove erratically, crossing a double yellow line at one point and twice turning left in front of oncoming traffic. He stopped in front of a residence, and as Copeland pulled up behind him, Bradley exited the vehicle and fled on foot. Copeland followed, ordering Bradley to "get down."

The foot chase and physical altercation that followed lasted two minutes and thirty-three seconds, ending when Copeland fired three shots into Bradley's chest, killing him. The parties' accounts of what transpired diverge considerably. Although Copeland's dashcam and microphone continued to record as the events unfolded, the majority of the fight took place off-camera.

*A. Copeland's Version of the Altercation*

According to Copeland, Bradley darted for and attempted to scale a "short 3 or 4 foot chain link fence, with chicken-wire fencing strung along the top," but was unable to clear it. Copeland was able to grab Bradley and ordered him to "[g]et down on the fucking ground." Bradley said he would comply, but instead grabbed Copeland by the bicep and attempted to shove him to the ground. As they grappled with each other, Copeland told Bradley to "get back," warning "I'm going to kill you."

As the pair raced across the street (and in front of the camera), Copeland attempted to taser Bradley. Bradley tripped as a result, but did not convulse, leading the officer to conclude that the taser prongs had gotten stuck in the suspect's shirt. Copeland kicked Bradley, but was unable to stop him from getting to his feet and continuing to flee. Thinking "it was best to take the Taser out of the equation so that [Bradley] could not use it on [him]," Copeland discarded the weapon as he pursued the suspect.

3

No. 16-50023

As Bradley attempted to climb another fence, Copeland caught up, grabbed him from behind, and forced Bradley to the ground on all-fours using a leg-sweep maneuver. Copeland repeatedly ordered Bradley to put his arms behind his back, but the suspect ignored him. Copeland tried to force Bradley's arms out from under him and "delivered several (3-5) hammer strikes to the side of Bradley's head and to his torso" in hopes that "he would reach up to block the strikes," enabling Copeland to force Bradley to the ground and hold him there until backup arrived. Instead, Bradley fought back, and being much larger than Copeland, quickly overcame his opponent. Feeling exhausted and concerned for his life, Copeland took one hand off of Bradley to radio for backup to "step it up." As he did this, Bradley was able to stand up and get the officer into a headlock, forcing him onto the ground on his hands and knees. As they wrestled, Copeland shouted "I'm going to fucking kill you" as a way of warning Bradley that "if he did not stop assaulting [him], [Copeland] would eventually resort to deadly force to end the threat to [his] life."

In response, Bradley grabbed the cord that connected the radio on Copeland's belt to the microphone on his shoulder and pulled it across Copeland's neck, choking him. Copeland "grabbed with one hand underneath the cord and tried to pull it off of [his] neck," causing the microphone to detach from the radio cord and preventing Bradley from cutting off his airway. Bradley then shifted tactics and attempted to grab Copeland's firearm, successfully "defeat[ing] one or two of the safety mechanisms on the holster designed to stop someone from simply snatching the weapon out of the holster." Copeland placed his hand on the butt of the gun to block him and yelled "Don't do it!" Bradley responded "I'll let go if you stop."

In an effort to get Bradley's hand off of his weapon, Copeland "fell with all of [his] body weight onto [his] right hip, where the holster was." The fall broke Bradley's contact with the pistol and enabled Copeland to kick Bradley away.

4

No. 16-50023

Bradley "did not use this opportunity to run away," but instead began to rise and come back towards Copeland. Exhausted and fearing for his life, Copeland stood up, drew his weapon, and fired three shots into Bradley's chest.

*B. Brenda Miller's 911 Call*

Brenda Miller lived nearby and witnessed the shooting. After hearing police sirens in the neighborhood, she called 911 to report seeing a "poor police officer" wrestling with a young man in her neighbor's yard. Gunshots are audible on the audio recording shortly after she connected with dispatch. When asked to describe exactly what happened, she stated, "I looked out my door, and this police officer was tangling with this guy. And all I know is that he had the police officer down on the ground and he looked like he was trying to take his gun and the officer stood up and shot him."

*C. Zachary Rife's 911 Call and Deposition*

Another neighbor, Zachary Rife, also witnessed the shooting. He called 911 to report seeing a "police officer in a fight with a guy across the street." He was concerned for the officer's safety, stating that "[h]e looks like he's about to be hurt, he looks like he's about to be smothered. . . . He needs help." A few moments later, Rife exclaimed that the black male the officer was fighting with was "about to pull [the officer's] gun off of him!" The combatants began "wrestling" shortly after that, and the encounter ended when "the cop shot him" (i.e. the male who was wrestling with the police officer). Gunshots are audible on that recording as well.

In a later deposition, Rife elaborated, stating that "Bradley had had an officer in a headlock" and that "they were kind of doing like 360s and fighting with their hands." He stated that at the time he "believe[d] that Officer Copeland's life or safety was in danger," describing the struggle as a "fight to the death." He also stated that Bradley "at the very end . . . went for the gun a couple times, and the cop shot him."

5

No. 16-50023

### D. *The Heirs' Version of the Altercation*

Plaintiffs are Bradley's family members and heirs. None of them personally witnessed the altercation. Nevertheless, they dispute Copeland's version of facts. They claim that after Copeland asked Bradley to step out of his vehicle, Bradley bolted "in fear of Copeland . . . knowing that, in two separate similar situations, Austin police officers had recently killed two other Black male drivers using similar minor traffic offenses as justifications for confronting each of them." They claim that once "Bradley observed Copeland following [he] stopped his vehicle and immediately exited the car . . . to avoid being assaulted and/or killed by Copeland." Within twelve seconds of leaving the car, Bradley heard Copeland threaten to kill him. Copeland then ordered Bradley to get down on the ground. The suspect complied, exposing himself to the officer's threats and physical assaults. "As Bradley laid himself on the ground, Copeland never attempted to handcuff or restrain him but kept striking and kicking him while telling him to stop resisting," even though at the time "Bradley was not resisting and was attempting to comply with Copeland's every demand." Eventually, the abuse was too much, and Bradley "broke away and ran into the street, in view of the car camera," at which point Copeland "used his taser, as a weapon, to strike Bradley across the head and face at least two times as Bradley fell to the street." More physical abuse and threats followed as Copeland chased Bradley into a neighboring yard.

Bradley managed to get Copeland into a headlock in an effort to restrain him, but "never squeezed Copeland's head or body or hit, or caused any injuries or pain to Defendant Copeland." He even attempted to barter a truce, telling Copeland "I'll let go if you stop. I promise." The headlock allegedly lasted two to three seconds, during which time "Bradley never had contact with, possession of or pulled on Defendant Copeland's radio cord and never reached for or touched Defendant Copeland's gun, radio, radio coil, holster, gun belt, or

6

any other weapon possessed by Defendant." After Copeland broke free of Bradley's restraint, "Plaintiff laid flat on his back on the ground, hands open" and "did not resist or fight [but] allowed Defendant to restrain him on the ground." With Bradley in this position, "with his buttocks and back flat on the ground, Defendant Copeland stood straight up and fired three bullets directly into the front body and left side of Plaintiff Bradley."

*E. Procedural History*

Copeland moved for summary judgment on qualified immunity grounds. The district court denied the motion, finding that in the absence of video evidence, the third-party, eyewitness accounts could not be credited until subject to cross examination. Copeland then timely appealed.

## II.

"Ordinarily, we do not have jurisdiction to review a denial of a summary judgment motion because such a decision is not final . . . ." *Gobert v. Caldwell,* 463 F.3d 339, 344 (5th Cir. 2006) (quoting *Palmer v. Johnson,* 193 F.3d 346, 350 (5th Cir. 1999)). But under the collateral order doctrine, a district court's "order denying qualified immunity, to the extent that it turns on an 'issue of law' is immediately appealable." *Behrens v. Pelletier,* 516 U.S. 299, 311 (1996) (citing *Mitchell v. Forsyth,* 472 U.S. 511, 530 (1985)). In these circumstances, this court reviews such interlocutory orders de novo.

## III.

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When making this determination, a court should review the record as a whole but "must disregard all evidence favorable to the moving party that the jury is not required to believe," *Moore v. Willis Indep. Sch. Dist.,* 233 F.3d 871, 874 (5th Cir. 2000), and instead only "give credence to the evidence favoring the nonmovant [and]

that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000) (internal quotation marks omitted).

Typically, the movant bears the initial burden of demonstrating the absence of a material fact issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). But "[a] good-faith assertion of qualified immunity alters the usual summary judgment burden of proof, shifting it to the plaintiff to show that the defense is not available." *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016) (internal quotation marks omitted). To do so, a plaintiff must "identify specific evidence in the summary judgment record demonstrating that there is a material fact issue concerning the essential elements of its case for which it will bear the burden of proof at trial." *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994). "Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation" are all insufficient to overcome immunity. *See Reyes v. Hornbeck Offshore Servs., L.L.C.*, 383 F. App'x 442, 443-44 (5th Cir. 2010) (quoting *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)).

In denying Copeland's motion for summary judgment, the district court disregarded the testimony of Copeland and two eyewitnesses, finding that because there was "no video evidence of the actual shooting" the "testimony of Copeland, the eyewitness, and the 9-1-1 caller . . . should not be accepted until subjected to cross examination." This finding is erroneous for two reasons.

First, the district court's decision flips Supreme Court precedent on its head. In *Scott v. Harris,* 550 U.S. 372, 375 (2007)*,* a police officer terminated a high-speed car chase by intentionally bumping a fleeing suspect's rear bumper, causing the suspect to lose control of his vehicle and crash, rendering him a quadriplegic. The suspect brought an excessive force claim under § 1983, and

the officer asserted qualified immunity. *Id.* at 375-76. At the summary judgment stage, the two parties presented radically different accounts of the chase. The police officer claimed that the suspect was driving so recklessly during the pursuit that it endangered human life, while the suspect "contend[ed] that he used his turn signals when passing or turning, and maintained control over his vehicle" the entire time. *Harris v. Coweta Cty.,* No. CIVA 3:01CV148WBH, 2003 WL 25419527, at *1 (N.D. Ga. Sept. 25, 2003). A dashcam recorded the entire car chase, and confirmed the officer's testimony. The video showed the suspect's vehicle:

> rac[e] down narrow, two-lane roads in the dead of night at speeds that are shockingly fast[;] . . . swerve around more than a dozen other cars, cross the double-yellow line, and force cars traveling in both directions to their respective shoulders[;] . . . run multiple red lights and travel for considerable periods of time in the occasional center left-turn-only lane, chased by numerous police cars forced to engage in the same hazardous maneuvers just to keep up.

*Scott,* 550 U.S. at 379-80. Nevertheless, the district court credited the suspect's testimony. *Harris,* 2003 WL 25419527, at *5. Finding that the conflicting evidence created a genuine issue of material fact, the district court denied the officer's motion. *Id.* The Eleventh Circuit affirmed. *Harris v. Coweta Cty.*, 406 F.3d 1307 (11th Cir. 2005). The Supreme Court, however, reversed, holding that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott,* 550 U.S. at 380.

The decision below inverses that holding. While *Scott* empowers a district court to disregard testimony that is at odds with video evidence, the holding below would prevent summary judgment from being granted in the absence of video evidence, effectively stripping all officers of qualified immunity if their actions were not recorded. This fundamentally flips the

burden back onto the government official. *Cf. Kovacic v. Villarreal*, 628 F.3d 209, 214 (5th Cir. 2010) ("[O]nce a defendant invokes qualified immunity, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity.").

Second, the district court was not permitted to disregard the testimony of the two eyewitnesses. There is no evidence to suggest that the pair was biased, and the district court specifically found that the heirs "[did] not offer any evidence to contradict the eyewitnesses' statements." Because their testimony was "uncontradicted and unimpeached," the district court was required to give it credence. Failure to do so amounted to an inappropriate "credibility determination[]." *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).

## IV.

We now turn to the question of whether Copeland was entitled to qualified immunity, applying the correct evidentiary standard for summary judgment articulated above. Giving full weight to the undisputed eyewitness testimony, we hold that the district court erred in denying Copeland's motion for summary judgment on qualified immunity grounds.

Section 1983 enables persons who have been "depriv[ed] of any rights, privileges, or immunities secured by the Constitution and laws" of the United States by the actions of a person or entity operating under color of state law to seek redress from those state actors responsible for the deprivations. 42 U.S.C. § 1983. But qualified immunity insulates those government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Courts use a two-prong analysis to determine whether a defendant is entitled to qualified immunity in a given case. The court must decide both whether the plaintiff has

No. 16-50023

alleged a violation of a constitutional right and whether that right was "clearly established" at the time of the incident. *Freeman v. Gore*, 483 F.3d 404, 410 (5th Cir. 2007). In *Pearson v. Callahan*, the Supreme Court determined that courts may tackle these questions in any order. 555 U.S. 223, 227 (2009).

The heirs assert three separate § 1983 claims: (1) that Copeland violated Bradley's Fourth Amendment right to be free from unreasonable seizures by initiating a traffic stop and asking Bradley to exit his vehicle without probable cause; (2) that Bradley used excessive force in his effort to detain Bradley; and (3) that Copeland used unlawful lethal force when he shot Bradley three times in the chest. Because the heirs did not raise the false arrest/illegal search claim in their complaint, their first argument is not properly before us and is waived. *See LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 387 (5th Cir. 2007). Their remaining two claims will each be discussed in turn.

*A. Non-Lethal Excessive Force*

The heirs claim that Copeland used non-lethal, excessive force on Bradley when Copeland: (1) "forcefully kick[ed] Bradley after he fell to the street;" (2) "[struck] Bradley about the head and face, with his taser in his hand;" (3) "us[ed] the taser as a weapon;" and (4) "use[d] his fist and feet to deliver numerous and continual punches, strikes, and hammer hits into Bradley's stomach, face and torso." To prevail on an excessive force claim, a plaintiff must show "(1) an injury (2) which resulted directly and only from the use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Ontiveros v. City of Rosenberg,* 564 F.3d 379, 382 (5th Cir. 2009). The inquiries as to whether police conduct was clearly excessive and clearly unreasonable often are intertwined. *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012). Copeland concedes that he injured Bradley during the altercation, but maintains that his actions were neither clearly excessive nor clearly unreasonable. We agree.

11

No. 16-50023

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). "The objective-reasonableness inquiry is fact-intensive, requiring consideration of circumstances such as the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Galvan v. City of San Antonio*, 435 F. App'x 309, 310-11 (5th Cir. 2010) (per curiam) (internal quotation marks omitted). "Officers may consider a suspect's refusal to comply with instructions . . . in assessing whether physical force is needed to effectuate the suspect's compliance." *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009). When dealing with an uncooperative suspect, police act within the scope of objective reasonableness when they "react[] with measured and ascending responses." *Galvan,* 435 F. App'x at 311.

It is undisputed that Bradley refused to comply with Copeland's instructions at the time he drove away. While there is a factual dispute as to whether Bradley's vehicle smelled like marijuana, the heirs concede that Bradley had a white residue on his face at the time of the traffic stop and that Copeland observed drug paraphernalia—plastic baggies—hidden in the backseat of Bradley's car. The heirs concede—and the video evidence confirms—that rather than step out of his vehicle as requested, Bradley chose to flee, driving erratically in an effort to escape the pursuing officer. When Copeland caught up to the suspect, Bradley took off on foot. By this point, Copeland already had reason to suspect that Bradley was involved in serious drug crimes. As such, some degree of non-lethal force was reasonable to counter the suspect's efforts to flee. *Galvan*, 435 F. App'x at 311.

No. 16-50023

Viewing the evidence in the light most favorable to Bradley, Copeland's conduct throughout the altercation consisted of the "measured and ascending responses" called for under this court's case law. *Id.* It is undisputed that Copeland repeatedly commanded Bradley to get down. While the heirs claim, without proffering any evidence to support their allegations, that Bradley initially "laid himself on the ground" in an effort to comply with Copeland's instructions, all of the actions complained of by the heirs occurred later, once Bradley and Copeland had crossed back within the frame of the dashcam or were observed by eyewitnesses, and it is clear that Bradley was resisting the officer's commands.

As such, this case is similar to *Carroll v. Ellington*, 800 F.3d 154, 176 (5th Cir. 2015), where the court found that several officers acted reasonably when they used escalating force to try and restrain a suspect actively resisting arrest. Specifically, the court upheld a holding of qualified immunity in a case where officers (a) repeatedly struck the suspect on the leg with a hickory stick, (b) then kicked him in the stomach, (c) tackled him, (d) struck him with their fists, and (e) finally tasered him several times. *Id.*; *see also Poole,* 691 F.3d at 629 (finding officers' conduct was not clearly excessive or objectively unreasonable when they responded to suspect's refusal to obey commands by first attempting to physically restrain him by the arm and then resorting to a taser when that failed). Here, after Bradley ignored Copeland's verbal commands and initial efforts to restrain him, Copeland deployed his taser. When the taser malfunctioned, he resorted to physical force—kicks, punches, and hammer strikes—to attempt to take down the suspect. Considering the totality of the circumstances including the size differential of the combatant and the duration of the altercation, which one eyewitness referred to as a "fight to the death," Copeland's conduct prior to the shooting was neither excessive nor unreasonable.

No. 16-50023

*B. Lethal Excessive Force*

The heirs' deadly excessive force claim is similarly unavailing. "An officer's use of deadly force is presumptively reasonable when the officer has reason to believe that the suspect poses a threat of serious harm to the officer or to others." *Ontiveros*, 564 F.3d at 382. The threat to the officer's life—and therefore the reasonableness of the force used—"must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396-97. As such, an officer's "underlying intent or motivation" at the time of the incident is irrelevant. *Id.*

Here, undisputed evidence demonstrates that Copeland used deadly force to protect himself. By the time Copeland drew and fired his weapon, Bradley—who was physically larger and stronger than Copeland—had already disobeyed verbal orders, put Copeland in a headlock, wrestled Copeland to the ground, and repeatedly reached for Copeland's firearm. One eyewitness described the altercation as a "fight to the death." Under the totality of the circumstances, a reasonable officer could have believed that his life was in danger.

The heirs claim that they have proffered enough evidence to raise genuine issues of material fact and should survive summary judgment. Specifically, they claim that the testimonies of Copeland's firearm expert Greg Karim and crime scene reconstruction expert Janice Johnson call into question the accuracy of the reenactment photos. They also claim that the lack of DNA evidence on Copeland's radio wire challenges Copeland's story that Bradley attempted to choke him with the chord. But the heirs have failed to provide any evidence challenging the principle dispositive "fact material to whether [Copeland] was justified in using deadly force": that Bradley repeatedly reached for the officer's firearm. *Manis v. Lawson*, 585 F.3d 839, 844 (5th Cir. 2009). This court has repeatedly found that it is objectively reasonable for an

14

officer to use deadly force even if he merely *believes*—albeit reasonably—that the suspect is reaching for a weapon. *See, e.g., id.* at 844-45 (collecting cases and finding that officer's use of deadly force was not excessive when undisputed evidence showed that suspect "in defiance of the officers' contrary orders, reached under the seat of his vehicle and appeared to retrieve an object that [the officer] reasonably believed to be a weapon"); *Ontiveros*, 564 F.3d at 385 (finding that officer acted reasonably when he shot suspect who had refused to obey orders and reached into his boot for something); *Colston v. Barnhart*, 130 F.3d 96, 99-100 (5th Cir. 1997) (finding it objectively reasonable for an officer to believe unarmed suspect posed a threat of serious bodily harm when suspect walked towards shotgun after assaulting another officer); *see also Johnson v. City of Phila.*, 837 F.3d 343, 350 (3d Cir. 2016) ("We begin with a proposition that can scarcely be disputed: once [the suspect] began reaching for [the officer's] gun, [the officer] was justified in using deadly force to defend himself."); *Jacobs v. City of Shreveport*, No. 04-2492, 2006 WL 3247095, at *11 (W.D. La. Nov. 8, 2006) (finding that officer's actions were objectively reasonable when he used lethal force after suspect "reached for [the officer's] gun several times" during a physical altercation). Copeland, Brenda Miller, and Zachary Rife all stated that prior to the shooting, Bradley attempted to grab Copeland's pistol. Absent evidence to the contrary, the court is required to accept this testimony as true. *See Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record . . . a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). The heirs have thus failed to satisfy their burden of establishing that Copeland's use of lethal force was unreasonable. *See Kovacic*, 628 F.3d at 214 (finding that defendant officers are entitled to qualified immunity when plaintiffs fail to present evidence to contradict the officers' affidavits with respect to dispositive factual matters).

No. 16-50023

Because the heirs have failed to demonstrate a constitutional violation, we hold that they have failed to satisfy their burden of showing that Copeland is not entitled to qualified immunity.

## V.

For the forgoing reasons, we REVERSE and hold that Copeland is entitled to qualified immunity.