# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
November 4, 2025

Lyle W. Cayce
Clerk

No. 24-30723

———————

Archie Williams,

*Plaintiff—Appellant*,

*versus*

City of Baton Rouge; Alfred Charles Mondrick, *Former Detective*; Marjorie Groht, *Former Detective*; Steven Woodring, *Former Detective*; Patrick Lane, *Former Forensic Scientist*; Sybil Guidry, *Former Investigator for the Office of the District Attorney for the East Baton Rouge Parish*; Jerry Miller, *Former Forensic Scientist*,

*Defendant—Appellees*.

———————————————————

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:20-CV-162

———————————————————

Before Jones, Stewart, and Ramirez, *Circuit Judges*.

Per Curiam:[*]

Archie Williams brought this lawsuit under 42 U.S.C. § 1983 against the City of Baton Rouge (the "City") and former detectives of the Baton Rouge Police Department, Alfred Charles Mondrick, Marjorie Groht, and

---

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 24-30723

Steven Woodring (collectively, the "Police Defendants"). Williams also sued former forensic scientists of the Louisiana State Police Crime Laboratory, Patrick Lane and Nace "Jerry" Miller (collectively, the "Forensic Defendants"). He brought a failure to train or supervise claim against the City. Williams alleges that the Police Defendants violated his Fourteenth Amendment right to due process by using an impermissibly suggestive photographic lineup procedure prior to his arrest. He further alleges that the Forensic Defendants violated his Fourteenth Amendment right to due process by suppressing exculpatory crime scene evidence. He also brought state law claims for malicious prosecution, spoliation of evidence, intentional infliction of emotional distress, and negligence against the Police and Forensic Defendants. The district court granted summary judgment in favor of the City and the Police Defendants as well as the Forensic Defendants. Thereafter, Williams appealed. Because we agree that the Police Defendants and Forensic Defendants are entitled to qualified immunity and that the district court did not err in granting summary judgment on Williams's state law and *Monell*[1] claims, we AFFIRM the district court's judgment.

## I

*A. Factual Background*

On December 9, 1982, Anne Eaton was raped and stabbed in her Baton Rouge home.[2] During the assault, Eaton was face-to-face with the assailant

---

[1] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

[2] This appeal involves a review of cross-motions for summary judgment under Federal Rule of Civil Procedure 56. "The court reviews district court judgment rendered on cross-motions for summary judgment de novo. 'On cross-motions for summary judgment, we review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party.'" *Century Sur. Co. v. Colgate Operating, L.L.C.*, 116 F.4th 345, 348–49 (5th Cir. 2024) (quoting *Discover Prop. & Cas. Ins.*

and noticed a scar on his right arm. Stephanie Alexander arrived at Eaton's home during the incident, walked upstairs, and saw the assailant and Eaton. After the assailant grabbed Alexander and told her to lie down on the floor, he fled the scene.

The Police Defendants investigated Eaton's assault. To identify the assailant, detectives Mondrick and Groht showed Eaton photographic lineups on five separate occasions. On December 15, 1982, Mondrick and Groht interviewed Eaton and showed her the first photographic lineup, which was based on Alexander's description of the suspect. Mondrick and Groht presented Eaton with forty-eight photographs of Black males with similar appearances, excluding a photograph of Williams. Eaton did not identify her assailant during this lineup. On December 16, 1982, Mondrick and Groht showed Eaton six photographs, excluding a photograph of Williams, and Eaton also failed to make a positive identification.

On January 3, 1983, Groht showed Eaton thirty additional photographs, excluding a photograph of Williams, and Eaton again failed to identify the suspect. Later that day, a confidential informant advised Woodring that Williams had committed the crime. Given this information, detectives later showed Eaton six photographs, including one of Williams. During this lineup, Eaton looked at the photograph of Williams, which looked "very, very close to her attacker." Eaton "felt pretty sure that this was the

---

*Co. v. Blue Bell Creameries USA, Inc.*, 73 F.4th 322, 327 (5th Cir. 2023) (citation omitted)). Because the district court granted the Forensic Defendants' motion for summary judgment, "this [c]ourt takes [Williams's] evidence as true and construes all facts and justifiable inferences in the light most favorable to [Williams]." *Id.* (citing *Discover Prop. & Cas. Ins. Co.*, 73 F.4th at 327). Therefore, the facts presented herein are as alleged by Williams.

man," but "said she could not be positive." Upon Eaton's request, the detectives then showed Eaton a side view of the lineup, including a photograph of Williams. Eaton similarly pinpointed the photograph of Williams, stating that it "looked the most like the [B]lack man who raped her" even though "she could not positively say."

On January 4, 1983, the Police Defendants presented another six-photograph lineup, including a newer photograph of Williams. Eaton "immediately pointed" to the photograph of Williams and "became very excited." The detectives also "immediately heard the victim scream in a loud voice that the subject in position #1," the position of Williams's photograph in the lineup, "was the [B]lack male [who] raped her." The detectives arrested Williams later that day. Before Williams's trial, Eaton identified Williams in a physical lineup. During the trial, Eaton also identified Williams as her assailant. When Williams stood before the jury and lifted his shirt as instructed by the prosecution, Eaton testified that the scar on Williams's right arm was the same scar that she saw on the day of the assault.

After the incident, the Forensic Defendants also assisted in the investigation. Lane lifted eight latent or invisible fingerprints from the crime scene and took photographs of the bedroom and bloody smears on the door. Sibyl Guidry, a latent print examiner at the Louisiana State Bureau of Identification, received fingerprints from Lane. Guidry identified no fingerprints as Williams's fingerprints. Miller assessed blood samples and Eaton's rape kit. Miller's Scientific Analysis Report indicated that the seminal fluid in Eaton's rape kit "could have originated from Archie Williams."

On April 21, 1983, a jury convicted Williams of aggravated burglary, aggravated rape, and attempted murder. After roughly thirty-six years in prison, Williams was exonerated based on fingerprint evidence that implicated another person as Eaton's assailant.

No. 24-30723

*B. Procedural History*

On March 17, 2020, Williams filed suit asserting 42 U.S.C. § 1983 claims against the City and the Police Defendants.[3] He alleged that the Police Defendants violated his Fourteenth Amendment right to due process by using an impermissibly suggestive photographic identification procedure and failing to disclose exculpatory crime scene evidence. He also asserted state law claims for malicious prosecution, spoliation of evidence, intentional infliction of emotional distress, and negligence against the Police Defendants. He further alleged § 1983 claims against the City for an unconstitutional policy, custom, or practice of failing to train or supervise. He also asserted claims against the Baton Rouge Police Department and Louisiana State Police Crime Lab Supervisors for supervisory liability.

Williams asserted § 1983 claims against the Forensic Defendants. He alleged that Lane and Guidry violated his Fourteenth Amendment right to due process by failing to disclose exculpatory crime scene evidence, fabricating crime scene evidence, and conducting a reckless investigation. He alleged that Miller violated his Fourteenth Amendment right to due process by fabricating and failing to disclose serological evidence.[4] Finally, he asserted state law claims for malicious prosecution, spoliation of evidence, intentional infliction of emotional distress, and negligence.

Williams filed an opposed motion for summary judgment against Lane, and the Forensic Defendants filed an opposed cross-motion for summary judgment. The district court granted the Forensic Defendants'

_____

[3] On May 12, 2020, Williams filed an amended complaint.

[4] Serology is "the study of blood serum." *Serology*, *Oxford English Dictionary* (2d ed. 1989).

5

motion for summary judgment, reasoning that they were entitled to qualified immunity. Williams timely appealed.

The City and the Police Defendants filed an opposed motion for summary judgment. The district court granted their motion for summary judgment on Williams's fabrication of evidence through impermissibly suggestive identification procedures and failure to disclose exculpatory evidence claims, reasoning that the Police Defendants were entitled to qualified immunity. Moreover, the district court granted summary judgment against Williams on his failure to train and supervisory liability claims because it found that there was no underlying constitutional violation. Finally, the district court granted summary judgment against Williams on his state law claims, citing the lack of evidentiary support and constitutional violation. Williams timely appealed.

## II

This court has jurisdiction under 28 U.S.C. § 1291 because the district court entered final judgments. It granted summary judgment in favor of the Forensic Defendants on June 10, 2024 as well as in favor of the City and the Police Defendants on October 18, 2024.

We review a district court's ruling on a motion for summary judgment de novo. *Sanders v. Christwood*, 970 F.3d 558, 561 (5th Cir. 2020). This court also reviews a district court's ruling on a motion for summary judgment based on qualified immunity de novo. *Griggs v. Brewer*, 841 F.3d 308, 311 (5th Cir. 2016). "Summary judgment is proper when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* at 311–12 (citing Fed. R. Civ. P. 56(a)). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

No. 24-30723

"An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Id.* "A party cannot defeat summary judgment with 'conclusory allegations,' 'unsubstantiated assertions,' or 'only a scintilla of evidence.'" *Lamb v. Ashford Place Apartments L.L.C.*, 914 F.3d 940, 946 (5th Cir. 2019) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

## III

On appeal, Williams raises four arguments.[5] First, he argues that the district court erred by holding that the Police Defendants were entitled to qualified immunity. Second, he asserts that the district court erred in granting the Police Defendants' motion for summary judgment on Williams's state law claims. Third, he contends that the district court erred in granting the City's motion for summary judgment on Williams's *Monell* claim. And fourth, he maintains that the district court erred by holding that the Forensic Defendants were entitled to qualified immunity. We address each of these arguments in turn.

### A. Police Defendants' Assertion of Qualified Immunity

Qualified immunity "shields public officials sued in their individual capacities 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319, 328 (5th Cir. 2020) (quoting *Harlow v. Fitzgerald*, 457

---

[5] As an initial matter, we note that Williams does not raise the following issues on appeal: the Police Defendants' failure to disclose exculpatory crime scene evidence, the City's supervisory liability, Guidry's assertion of qualified immunity, and state law claims against the Forensic Defendants. Accordingly, these issues are forfeited on appeal. *See Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021) ("A party forfeits an argument . . . by failing to adequately brief the argument on appeal.").

U.S. 800, 818 (1982)). "When a public official makes 'a good-faith assertion of qualified immunity,' that 'alters the usual summary-judgment burden of proof, shifting it to the plaintiff to show that the defense is not available.'" *Id.* at 329–30 (quoting *Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016)). "A court's decision on qualified immunity involves two questions: (1) whether the defendant violated the plaintiff's constitutional or statutory rights; and (2) whether those rights were clearly established at the time of the violation 'such that the officer was on notice of the unlawfulness of his or her conduct.'" *Roque v. Harvel*, 993 F.3d 325, 331 (5th Cir. 2021) (quoting *Cole v. Carson*, 935 F.3d 444, 451 (5th Cir. 2019)).

A right is clearly established if "the contours of the right" are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 635 (1987). "The defendant's acts are held to be objectively reasonable unless *all* reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the United States Constitution or the federal statute as alleged by the plaintiff." *Thompson v. Upshur Cnty.*, 245 F.3d 447, 457 (5th Cir. 2001) (emphasis in original) (citing *Anderson*, 483 U.S. at 641). To determine that a right is clearly established, courts "must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011) (internal quotation marks omitted).

In the context of photographic lineups, the Court has observed that "[i]t is the likelihood of misidentification which violates a defendant's right to due process." *Neil v. Biggers*, 409 U.S. 188, 198 (1972). While the Court has acknowledged that "improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals," it has been "unwilling to prohibit its employment, either in the exercise of [its]

supervisory power or, still less, as a matter of constitutional requirement." *Simmons v. United States*, 390 U.S. 377, 383–84 (1968). The Court has explained that "each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id.* at 384. Even if an identification process is impermissibly suggestive, courts must determine "whether under the 'totality of the circumstances' the identification was reliable." *Neil*, 409 U.S. at 199. Courts consider the following factors in assessing the likelihood of misidentification or reliability: (1) "the opportunity of the witness to view the criminal at the time of the crime"; (2) "the witness' degree of attention"; (3) "the accuracy of the witness' prior description of the criminal"; (4) "the level of certainty demonstrated by the witness at the confrontation"; and (5) "the length of time between the crime and the confrontation." *Id.* at 199–200.

Williams argues that the Police Defendants are not entitled to qualified immunity. He notes that "[a]s early as 1968, our High Court has recognized that constitutional deprivations may occur when a victim is presented multiple photographic lineups depicting the same person." He also asserts that there are genuine issues of material fact regarding whether the Police Defendants' successive identification procedure carried a substantial risk of misidentification because many facts show that the Police Defendants' conduct was unreasonable. Moreover, Williams cites his expert's report, which "strongly condemns the [Police] Defendants' repeated use of [Williams's] photographs in successive lineups."

The Police Defendants respond that they are entitled to qualified immunity because "[n]othing in the investigative process for the photograph or in-person lineups was suggestive or otherwise gave rise to an obvious or

apparent violation of [Williams's] civil rights." They interpret *Simmons* as supporting their qualified immunity defense, arguing that Williams "ignores the materiality and value of the criminal trial cross examinations of the victim and the investigation officer (Groht)." They also argue that Williams "calls no attention to the shoulder scar description given by the victim and the confirmation of that scar upon [Williams's] shoulder as demonstrated in open court to the criminal trial jury." Applying the factors outlined in *Neil*, 409 U.S. at 198, the Police Defendants argue that their identification process was reliable and non-suggestive. Addressing Williams's claim that there are genuine issues of material fact, they contend that his expert's report was "speculative" and "in direct contradiction to the evidence, the victim's criminal trial testimony."

The district court correctly held that the Police Defendants were entitled to qualified immunity. We agree that Williams does not provide sufficient support to establish that the Police Defendants' photographic identification procedure was so impermissibly suggestive and unreliable as to violate his due process rights.

Williams first cites *Simmons* for its discussion of the risks of misidentification associated with photographic lineups, but the Court generally condones the practice. 390 U.S. at 384 ("Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs."). The Court has also noted that "[t]he danger that [photographic identification] may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error." *Id.* Here, Eaton and the Police Defendants were subject to

cross-examination, potentially lessening the risk of a conviction based on misidentification.

Williams also fails to establish that the Police Defendants' conduct violated his due process rights. He does not provide concrete evidence that suggests that the identification procedure was impermissible. And even if Williams had sufficient evidence to prove that the procedure was unduly suggestive, he has not proven that the procedure was unreliable. Under *Neil*, 409 U.S. at 198, the Police Defendants' procedure was likely reliable enough to afford Williams due process. First, Eaton had the opportunity to view the assailant at the time of the crime because she was face-to-face with him multiple times during the assault like the victim in *Neil*. *See* 409 U.S. at 200–01. Second, Eaton paid attention to the assailant because she "decided that if [she] lived through it [she] was going to know who that person was, and [she] was going to be able to draw a good composite." Third, Eaton's prior description of the criminal was somewhat accurate because she was able to recall the scar that he had during trial. Fourth, Eaton exhibited a level of certainty at the confrontation when she was shown a photograph of Williams on January 4, 1983, as well as during a physical lineup and at trial even though she had not previously made a positive identification. Fifth, Eaton identified Williams less than one month after the incident, which was a shorter length of time than the seven months that had elapsed between the crime and confrontation in *Neil*. *See* 409 U.S. at 201. Given the totality of the circumstances, the Police Defendants' procedure was likely reliable enough to afford Williams due process.

Williams's claim also fails because there is no genuine issue of material fact. Williams argues that "there are a multitude of specific facts demonstrating that the actions of the [Police] Defendants were objectively unreasonable, and carried a substantial risk of misidentification." However, "[a]n issue is 'genuine' if the evidence is sufficient for a reasonable jury to

return a verdict for the nonmoving party." *Hamilton*, 232 F.3d at 477 (citing *Anderson*, 477 U.S. at 248). "A party cannot defeat summary judgment with 'conclusory allegations,' 'unsubstantiated assertions,' or 'only a scintilla of evidence.'" *Lamb*, 914 F.3d at 946 (quoting *Liquid Air Corp.*, 37 F.3d at 1075). Here, even if the facts Williams lists are material, the evidence is insufficient for a reasonable jury to return a verdict for him because he provides no argument as to why these facts create a genuine issue of material fact. While Williams cites his expert's report as support, it includes unsubstantiated assertions such as a statement that the detectives could have given "verbal or non-verbal cues" to Eaton "to help break the 'tie' between Williams" and another person in the photographic lineup.

In sum, Williams failed to prove that the Police Defendants' photographic identification procedure violated his constitutional or statutory rights under the first prong of the qualified immunity test. Even if the Police Defendants were not entitled to qualified immunity, Williams's claim still fails because there is no genuine issue of material fact due to insufficient support. For these reasons, the district court did not err by holding that the Police Defendants were entitled to qualified immunity.

### B. Williams's State Law Claims Against the Police Defendants

The district court did not err in granting the Police Defendants' motion for summary judgment on Williams's state law claims. "A party forfeits an argument . . . by failing to adequately brief the argument on appeal." *Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021). As an initial matter, Williams has forfeited this issue because he did not adequately brief it on appeal. He provides no support for his argument that the Police Defendants are not entitled to summary judgment on his state law claims.

But even if he has not forfeited his state law claims, the district court had discretion to dismiss them. "A district court's decision whether to

exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367). "Ordinarily, when the federal claims are dismissed before trial, the pendent state claims should be dismissed as well." *Wong v. Stripling*, 881 F.2d 200, 204 (5th Cir. 1989) (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)). We review the decision to retain jurisdiction over state claims for abuse of discretion. *Parker & Parsley Petrol. Co. v. Dresser Indus.*, 972 F.2d 580, 585 (5th Cir. 1992). Williams argues that the district court erred because there are genuine issues of material fact as to the reasonableness of the Police Defendants' conduct, which underlies his federal claims. We disagree. The district court dismissed Williams's state law claims because he failed to provide evidence in support of his claims. The district court also found no constitutional violation under § 1983. For this reason, the district court did not abuse its discretion in deciding to exercise supplemental jurisdiction over Williams's state law claims after it dismissed his federal claims. *See Wong*, 881 F.2d at 204.

### C. *Williams's* Monell *Claim Against the City*

A city may be held liable under § 1983 if the plaintiff proves three elements: "a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into

contact.'" *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). Deliberate indifference requires "proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997)).

Williams argues that the district court erred in granting the City's motion for summary judgment because there are genuine issues of material fact on the issue of whether the City is liable under *Monell*. He contends that "the lead detectives did not have a training protocol that informed them of, or warned them against, the potential for due process violations attendant to presenting multiple photographic lineups featuring the same person to victims."

The City responds that there is no genuine issue of material fact because Williams "offers no factual information to support or suggest that the [City], through its police department, had a written or unwritten policy, practice, or pattern of investigative means and methods as specifically alleged against the officers herein attributable to [Williams's] arrest." The City also argues that "there was no national standard in policing on how an officer was to conduct a photograph line-up."

The district court did not err in granting summary judgment on Williams's *Monell* claim against the City. Williams failed to establish that the City violated Williams's constitutional rights. Additionally, he failed to prove that the City's lack of a training protocol constituted deliberate indifference. He provides neither evidence that the City violated his constitutional rights nor evidence that the City consciously disregarded the known risk of due process violations from improper photographic lineups. Thus, the district court did not err in granting the City's motion for summary judgment on Williams's *Monell* claim.

No. 24-30723

### D. Forensic Defendants' Assertion of Qualified Immunity

"[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). To establish a *Brady* violation, a party must prove: "(1) the prosecutor *suppressed* evidence, (2) *favorable* to the defense, (3) and *material* to guilt or punishment." *Miller v. Dretke*, 431 F.3d 241, 245 (5th Cir. 2005) (emphasis in original) (citing *Brady*, 373 U.S. at 87). "To have been suppressed, the evidence must not have been discoverable through the defendant's due diligence." *United States v. Brown*, 650 F.3d 581, 588 (5th Cir. 2011). "Evidence is *material* if there is 'a *reasonable probability* that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Miller*, 431 F.3d at 245 (emphasis in original) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

Williams argues that former forensic scientist Lane is not entitled to qualified immunity because concealing exculpatory evidence has been a "clearly established" constitutional violation since 1967. Williams cites *Geter v. Fortenberry*, 849 F.2d 1550 (5th Cir. 1988), arguing that the law is clearly established that a crime scene investigator's suppression of exculpatory evidence sustains a claim under § 1983. He further asserts that the photograph of a bloody fingerprint that Lane took at Eaton's home ("Photograph 10-5") was material evidence concealed from Williams's defense team.

Williams also contends that former forensic scientist Miller is not entitled to qualified immunity because his report was "misleading and scientifically inaccurate." He argues that Miller "conspicuously failed to report that, in addition to [Williams], over 90% of the population similarly

15

'could not be excluded' as a donor of the seminal fluids extracted from [Eaton's] rape kit." He further contends that Miller failed to conduct any form of enzyme testing, which Williams asserts was widely used in the early 1980s and could have excluded Williams as a donor of the semen collected from Eaton's rape kit.

The Forensic Defendants respond that they are entitled to qualified immunity because Williams did not establish that they violated clearly established law. They note that *Brady* did not apply to forensic scientists in 1983. Even if *Brady* applied, the Forensic Defendants argue that Williams has not proven a *Brady* violation.

The district court did not err by holding that Lane was entitled to qualified immunity. First, Williams failed to prove that Lane's conduct violated a clearly established precedent at the time of the violation. Williams's due process right under *Brady* was not clearly established at the time of violation. As of 2001, the Court explained that "neither police officers nor lab technicians have a *Brady* duty to disclose exculpatory information." *Mowbray v. Cameron Cnty.*, 274 F.3d 269, 278 (5th Cir. 2001). Therefore, Lane would not have been on notice that his conduct may have violated the Constitution because *Brady* had not been extended to lab technicians and forensic scientists in the 1980s. Even if *Brady* had been extended to lab technicians and forensic scientists in the context of the deliberate concealment of evidence, Williams cites no evidence that Lane acted in bad faith. *See Mowbray*, 274 F.3d at 278 n.5. According to Lane's affidavit, "he possessed no desire or intent to hide or suppress any evidence on any crime scene visited during his career," including the crime scene at Eaton's home on December 9, 1982. Thus, Williams failed to establish a violation of a "clearly established" right under the first prong of the qualified immunity test.

Even if *Brady* applied to Lane, Williams failed to show that Lane's conduct constituted a *Brady* violation. To establish a *Brady* claim, a party must prove: "(1) the prosecutor *suppressed* evidence, (2) *favorable* to the defense, (3) and *material* to guilt or punishment." *Miller*, 431 F.3d at 245 (emphasis in original) (citing *Brady*, 373 U.S. at 87). Here, there is no evidence that Lane suppressed Photograph 10-5. This photograph was available to the defense and could have been discovered by the defense despite Williams's claims. For example, during the pre-trial hearing on the defense's supplemental motion for discovery held on March 11, 1983, the prosecution stated that it was willing to provide photographs of the crime scene to the defense. Because Williams failed to establish that Lane suppressed Photograph 10-5, Williams failed to prove a *Brady* violation.

Additionally, Photograph 10-5 was not material to Williams's guilt or innocence. According to Dr. Glenn Langenburg, the defense's fingerprint expert, "Photograph 10-5 would not have assisted the defense of [Williams's] trial in any respect because the meaningful information in that photograph was better included on Exhibit S-12 (more particularly L6b) and because the right portion of the photograph contains no additional discriminating ridge detail." Additionally, at Williams's trial, the prosecutor told the jury that "you will be presented with evidence that several fingerprints were taken from the scene, none of which match the defendant. As a matter of fact there are two fingerprints taken from the scene that don't match anybody that we made." Similarly, Williams's defense attorney instructed the jury to "[p]ay close attention [to] those fingerprints—none of those fingerprints are [] [Williams's], none. Some have not been identified." Because Photograph 10-5 was immaterial, Williams did not establish that Lane violated his rights under *Brady*. Thus, the district court correctly held that Lane was entitled to qualified immunity.

The district court also did not err by holding that Miller was entitled to qualified immunity. As discussed above, *Brady* did not apply to lab technicians and forensic scientists at the time of the alleged violation, so Williams failed to prove that Miller's conduct violated a clearly established precedent. Like Williams's claim regarding Lane, Williams presents no evidence that Miller acted in bad faith such that *Brady* would extend to his conduct.

Even if *Brady* applied to Miller, Williams also has failed to establish that Miller's conduct violated his constitutional or statutory rights. First, Williams has not established that Miller's failure to reference demographic statistics is a *Brady* violation. "*Brady* does not require the prosecution 'to conduct a defendant's investigation or to assist in the presentation of the defense's case.'" *United States v. Aubin*, 87 F.3d 141, 148 (5th Cir. 1996) (quoting *United States v. Marrero*, 904 F.2d 251, 261 (5th Cir. 1990)). Moreover, "*Brady* does not obligate the State to furnish a defendant with exculpatory evidence that is fully available to the defendant through the exercise of reasonable diligence." *Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir. 2002) (citing *Rector v. Johnson*, 120 F.3d 551, 558 (5th Cir. 1997)). Here, Miller's report indicated that the seminal fluid in Eaton's rape kit "could have originated from Archie Williams." That Miller did not also report that "over 90% of the population similarly 'could not be excluded' as a donor" does not rise to the level of a *Brady* violation, especially since the defense could have discovered this information through due diligence. The defense could have asked Miller about demographic statistics at trial. Miller's report is consistent with his trial testimony where he admits that there was "no way" he could "say absolutely" that Williams was the assailant. Therefore, Williams has not proven that Miller's failure to reference additional statistics violated his due process rights.

No. 24-30723

Moreover, Williams has not shown that Miller's failure to conduct an enzyme test violates *Brady*. Under *Brady*, "the prosecution has an 'affirmative duty . . . to produce at the appropriate time requested evidence which is materially favorable to the accused either as direct or impeaching evidence.'" *United States v. Beaver*, 524 F.2d 963, 966 (5th Cir. 1975) (quoting *Williams v. Dutton*, 400 F.2d 797, 800 (5th Cir. 1968)). However, "*Brady* clearly does not impose an affirmative duty upon the government to take action to discover information which it does not possess." *Id.* Here, there is no indication in the record that Williams requested an enzyme test from Miller, and Miller did not have an affirmative duty to perform one. Thus, Williams has not demonstrated that Miller's failure to conduct an enzyme test violated his due process rights.

In sum, Williams failed to establish a violation of his constitutional or statutory rights and, in turn, failed to rebut the Forensic Defendants' qualified immunity defense. Thus, the district court did not err by holding that the Forensic Defendants were entitled to qualified immunity.

## IV

For the foregoing reasons, we AFFIRM the district court's judgment.